2007 ND 108

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Lenora M. FRIEDT, Defendant and Appellant.**

No. 20060276.

Supreme Court of North Dakota.

July 5, 2007.

Brandi Sasse Russell, Assistant State's Attorney, Bismarck, N.D., for plaintiff and appellee.

Mandy R. Maxon (argued), Timothy Q. Purdon, and Mark A. Friese, of Vogel Law Firm, Bismarck, N.D., for defendant and appellant.

MARING, Justice.

[¶ 1] Lenora Friedt appeals a criminal judgment convicting her of driving a vehicle with an alcohol concentration of at least .08 percent by weight as measured by a chemical test performed within two hours after driving. We affirm the criminal judgment.

I

[¶ 2] On May 21, 2006, Friedt was arrested for driving under the influence of alcohol ("DUI"). The arresting officer, Steven Mayer, testified that he transported Friedt to a hospital to have her blood drawn, and once at the hospital, obtained a sealed blood sample kit.

[¶ 3] Officer Mayer testified that he witnessed Suzette McCall, a registered nurse, draw Friedt's blood. On the submission for blood form, Form 104, Nurse McCall marked that she used an intact blood sample kit; used the disinfectant, needle, guide, and blood tube provided in the blood sample kit; observed powder in the blood tube; and drew blood into the

blood tube and inverted the blood tube several times. Nurse McCall recorded the date and time she drew Friedt's blood and signed the form.

[¶ 4] On Form 104, Officer Mayer recorded Friedt's personal information, noted that blood was drawn from Friedt's left arm after her arrest for DUI, and noted Friedt's blood would be submitted to the North Dakota State Crime Laboratory. Officer Mayer completed the bottom portion of Form 104 that was to be completed by the individual submitting the blood, detached, and retained for his records. He recorded the date and times the blood was obtained and sealed. Officer Mayer marked that an intact blood sample kit was used; a completed seal was placed over the top and down the sides of the blood tube; the blood tube was placed inside a protective container and then placed in a plastic bag; the plastic bag and the completed top portion of Form 104 were placed in the blood sample kit box, which was closed; and a tamper-evident shipping seal was placed on the blood sample kit box. Officer Mayer testified that he mailed the blood sample kit to the North Dakota State Crime Laboratory.

[¶ 5] Michelle Burkett, the forensic scientist who analyzes blood samples for the North Dakota State Crime Laboratory, marked on Form 104 that Friedt's blood arrived in a labeled blood tube in a sealed container. Burkett recorded the time and date Friedt's blood was received and signed the form. The North Dakota State Crime Laboratory's blood analysis results, Form 107, indicated Friedt had an alcohol concentration of .11 percent by weight and that an approved method was used to conduct the blood analysis. Burkett signed Form 107.

[¶ 6] At trial, the State presented the testimony of Officer Mayer and Burkett, and offered into evidence State's Exhibit 4, which consisted of Form 104 and Form 107, and a certification of those forms. The detached bottom portion of Form 104 was offered and received into evidence as State's Exhibit 3. Friedt objected to the admission of State's Exhibit 4 on the grounds she was not given the opportunity to confront Nurse McCall at trial. The trial court overruled Friedt's objection. The jury found Friedt guilty of driving a vehicle with an alcohol concentration of at least .08 percent by weight as measured by a chemical test performed within two hours after driving. Friedt appeals.

II

[¶ 7] On appeal, Friedt argues State's Exhibit 4 was inadmissible because Form 104 contained hearsay that was testimonial and, therefore, improperly admitted because she was not given her Sixth Amendment right to confront Nurse McCall. Friedt also argues the State bears the burden to establish an affirmative waiver of a constitutional right, and that a waiver theory is inapplicable in this case. Questions, the answers to which are not necessary to the determination of an appeal, will not be considered by this Court. *State v. Waters*, 542 N.W.2d 742, 745 (N.D.1996). This Court will refrain from deciding constitutional questions if it can decide a dispute on other grounds. *Id.* We are able to decide on evidentiary grounds whether State's Exhibit 4 was properly admitted. Therefore, it is not necessary to decide Friedt's constitutional claims. The evidentiary issue is whether the State established proper foundation for the admission of Form 104.

III

[¶ 8] A trial court has broad discretion when deciding evidentiary matters. *Davis v. Killu*, 2006 ND 32, ¶ 6, 710 N.W.2d 118. On appeal, this Court will

not overturn the trial court's admission or exclusion of evidence unless the trial court has abused its discretion. *Id.* Abuse of discretion occurs when a trial court acts arbitrarily, unconscionably, or unreasonably, or when a decision is not based on a rational mental process. *Id.*

■ [¶ 9] Section 39–20–07, N.D.C.C., governs the evidentiary use of blood analysis results. *State v. Jordheim,* 508 N.W.2d 878, 881 (N.D.1993). "The State has the burden to prove the blood test was collected following the proper procedures set forth by the state toxicologist." *State v. Lynch,* 2001 ND 173, ¶ 12, 635 N.W.2d 164. The statute lessens the State's burden in laying an evidentiary foundation for the admission of the blood analysis results. *Jordheim,* at 881. Under N.D.C.C. § 39–20–07(5), blood analysis results must be received in evidence when compliance with the methods approved by the state toxicologist have been shown. First, the blood sample must be properly obtained; second, the blood analysis must be fairly administered; third, the method and devices used to analyze the blood must be approved by the state toxicologist; and fourth, the blood analysis must be performed by an authorized individual or by an individual certified by the state toxicologist as qualified to perform the test. *Id.*

[¶ 10] Form 104 was drafted by the state toxicologist to be used when blood is drawn for blood analysis. *State v. Steier,* 515 N.W.2d 195, 196 (N.D.App.1994). In *Jordheim,* 508 N.W.2d at 881, this Court reviewed the use of Form 104 to satisfy the foundational elements of N.D.C.C. § 39–20–07(5).

Form 104 has three sections that correspond to the conduct of the three people who normally participate in administering the blood test. The top half of the form includes the name of the person whose blood is drawn, and a list of directions for both the specimen collector and the recipient of the sample at the laboratory. The bottom half of the form contains a similar list for the specimen submitter. The submitter, who will usually be a police officer, is directed to retain this half of Form 104 in police records, undoubtedly for later evidentiary use.

*Id.* at 881–82. "Given the detailed directions in Form 104, it is difficult to imagine a case when certified compliance with them will not also furnish facial evidence that the sample was properly obtained and the test fairly administered...." *Id.* at 882.

[¶ 11] Although Friedt's argument on appeal was framed as a constitutional issue, the crux of her assertion is that, without presenting the testimony of Nurse McCall, the State did not show Friedt's blood was properly obtained, and therefore, State's Exhibit 4 was inadmissible. Friedt did not take issue with the satisfaction of the remaining foundational requirements of N.D.C.C. § 39–20–07(5).

■ [¶ 12] "An adequate foundation may be established by testimony that identifies the evidence and establishes the competency, materiality, and relevancy of the evidence." *State v. Noorlun,* 2005 ND 189, ¶ 15, 705 N.W.2d 819. The State presented the testimony of Officer Mayer to show that Friedt's blood was properly obtained and thereby lay the foundation for the admission of Form 104:

Q. Who did you make contact with on this particular occasion to do the blood draw?

A. It would have been Nurse McCall.

Q. What do you have the nurse do when you start to do this blood test?

A. First I take a blood sample box which contains all the necessary

supplies to take the blood test, and I show the suspect the box.

. . . .

Q. What type of items are in this kit or box?

A. There would be a sterile needle, a collection needle, and then also a glass vial that the blood goes into as well as a bubble wrap, and it would—like, a little small Ziploc bag.

Q. And are you familiar with these kits?

A. Yes, I am.

Q. How are you familiar with them?

A. Through training, and also I've seen them numerous times.

Q. And is the kit sealed in any manner when you first get it?

A. Yes, it is.

Q. How is it sealed?

A. It is sealed with—it's, like, and evidence tape that can show if it's been tampered with at all.

Q. Was the kit that you obtained in this particular case, was it sealed?

A. Yes, it was.

. . . .

Q. Did you then inspect the contents of the kit to make sure that everything was there?

A. Yes, I did.

Q. How were the items in this particular kit packaged?

A. The entire kit was intact and verified by the nurse.

Q. So you basically go over and make sure that every single thing is inside this kit that's to be utilized by the nurse, correct?

A. That is correct.

Q. You inspect it?

A. Yes, I do.

Q. How do you know that everything is inside the kit that's supposed to be there?

A. There is a checklist that we follow that shows the procedure, and then also the nurse will also tell us if there's something missing, which at this time there was nothing missing in the kit.

Q. What did you then do with the kit once it's been verified that it has everything it needs?

A. Then I open the kit and the nurse takes the blood vial and the needle, and I proceed to fill out the 104 form, which is asking for—asking the state crime lab to do a blood test, and it also has the suspect's information on it.

Q. Just going back to the registered nurse we talked about here, you said it was a Nurse McCall, correct?

A. Yes.

Q. How do you know that she's a registered nurse?

A. She signs the 104 form as to the time that she took the blood draw, and she signed her name as Nurse McCall, RN, Suzette.

. . . .

Q. Was any blood drawn from the defendant?

A. Yes, it was.

. . . .

Q. Were you present the entire time that this blood was taken from the defendant?

A. Yes, I was.

Q. You actually observed the blood being drawn from the defendant?

A. Yes, I did.

Q. What exactly did you see the nurse do?

A. The nurse—if I may refer to my notes real quick. I believe she took the blood draw, and what I'm referring to is the 104 form. She took the blood draw from the left arm of Ms. Friedt.

Q. And did she use the materials to do so that was provided for in the kit?

A. Yes, she did.

. . . .

Q. And after the blood draw is done, what does—what happens with the needle or the blood at that point?

A. The needle is usually disposed of, or I shouldn't say usually, is disposed of in a biohazard container, and the glass bottle containing the blood is then handed to me.

Q. And what do you then do with that vial as far as the kit?

A. What I do is I fill out the sealed label that goes over the top of the vial so that when the crime lab gets it, they can see that it has not been tampered with, and then the nurse also signs that seal. And it shows up as the—again, on the 104 form, that time that it was sealed.

Q. So this vial is labeled, is that correct, or the kit is labeled?

A. Yes, it is.

Q. Is there information inside this kit with the blood identifying whose blood it was that was taken?

A. Yes.

Q. What type of information is that?

A. It gives the person's name, their date of birth, their weight, and what you're requesting. If the person has been arrested for a DUI or actual physical control, if you're requesting a blood sample for alcohol or if you're requesting a blood sample for drug use.

Q. And so you then packaged this blood up to be sent to the state crime lab; is that correct?

A. Yes.

Q. And you make sure that the information is contained in this kit when it goes back to them; is that correct?

A. That is correct.

Q. What paperwork is filled out to insure that you have everything in that kit and everything is basically marked as valid?

A. What I fill out—I fill the 104 form out, and then I also on the bottom of the 104 form is what's called a blood checklist, collection checklist.

. . . .

Q. Now, just going back to the blank Form 104 here that you indicated was filled out on May 21st, what parts are filled out by whom?

A. The top part, I fill out. It's asking the subject's name, date of birth, weight, gender. Again, if they're arrested for DUI or personal request for the reason for the blood draw. It also lists their driver's license number, if it's a specimen of blood or urine, and who the specimen is submitted by and the submitting agency, our agency's address. And then also where it says remarks, that's where I write in which arm that the draw was taken off of.

Included in this is the checklist that the collector or the nurse uses to make sure that an intact kit has been used, and also to check to make sure that there's powder in the vial. And the other side is for laboratory use, which it's assigned a case number, and they also ask where the—how the vial has been received or how the specimen has been received, the time it's

been received, and if it was in the sealed container and in a sealed blood tube.

Q. So basically you fill out a portion of this, the nurse fills out a portion of this, correct?

A. That's correct.

Q. And then it goes to the state lab who also completes a portion of this once they receive it?

A. That's correct.

. . . .

Q. And just going back to the kit itself briefly, you indicated there was a vial that the blood goes into; is that correct?

A. That's correct.

Q. What does that vial contain?

A. It contains a light pinkish powder.

Q. Do you know what that is for?

. . . .

THE WITNESS: It's to help the blood from coagulating.

Q. And you're able to observe this vial when you open up the kits, correct?

A. Yes.

Q. Did you observe it in this particular case?

A. Yes, I did.

Q. What exactly did you observe about that vial?

A. The vial was—the glass vial did have the light pinkish-colored powder inside the vial.

Q. Is this the same observations you make of all the kits, or was it any different?

A. No, it's the same.

Q. Then once you've completed this whole process, done your checklist, sealed and packaged your bag or the box, the kit with the blood in it, what happens next?

. . . .

A. It's mailed to the state crime lab.

. . . .

Q. Then at some point in time do you receive anything back from the state crime lab?

A. Yes. Depending on how busy they are, sometimes two to three weeks later we'll receive results back showing the actual alcohol content in the blood.

Q. And in this case, did you receive something back from the crime lab?

A. Yes, I did.

. . . .

Q. And according to the lab results that you received back, what was the blood alcohol concentration of the defendant on May 21st, 2006?

A. The alcohol concentration came back at a .11.

[¶ 13] Officer Mayer's testimony laid the foundation for the admission of Form 104. Officer Mayer testified that he witnessed the entire blood draw. Officer Mayer personally observed the blood draw by the registered nurse and, based on his personal observations, he was able to testify how Friedt's blood was obtained. Officer Mayer testified that he inspected the contents of the blood sample kit to ensure it contained all the necessary supplies. He testified that everything that was supposed to be in the blood sample kit was found in the kit used to draw Friedt's blood. He testified that the nurse used the materials in the kit to take the blood draw. Officer Mayer testified that the blood tube used when drawing Friedt's blood contained a pink powder. Further, Burkett testified that Friedt's blood sample, on arrival at the State Crime Laboratory, was healthy, whole blood, which indicated powder was properly used to preserve it. Burkett was available for cross-examination to elicit

whether Friedt's blood sample was properly preserved. Officer Mayer was also available for cross-examination about his personal observations of the blood draw. Officer Mayer's testimony showed that Friedt's blood was properly obtained, and laid the foundation for the admission of Form 104.

IV

[¶ 14] We conclude the trial court did not abuse its discretion in admitting State's Exhibit 4, Form 104. We affirm the criminal judgment.

[¶ 15] GERALD W. VANDE WALLE, C.J., BRUCE E. BOHLMAN, S.J., DANIEL J. CROTHERS, and DALE V. SANDSTROM, JJ.

[¶ 16] The Honorable BRUCE E. BOHLMAN, S.J., sitting in place of KAPSNER, J., disqualified.